IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDRE WILLIAMS, #438-037, 3355645, :

    Plaintiff :

    v. :    Civil Action No. DKC-16-276

WARDEN J. PHILIP MORGAN, :
LIEUTENANT WILLIAM MCKINLEY,
SGT. BRADLEY YONKER, :
OFFICER JAMES FIORITA,
SGT. DUANE BAIR, :
SGT. GARY DURBORAW,
OFFICER HARRY CARR, :
OFFICER MATTHEW HOLLAR,
    :
    Defendants

**MEMORANDUM OPINION**

Plaintiff Andre Williams, a Maryland Division of Correction prisoner currently housed at Western Correctional Institution ("WCI"), has filed a civil rights action seeking $300,000.00[1] and alleging that seven correctional officers entered his cell and assaulted him. In response, Defendants filed a motion to dismiss or, in the alternative, motion for summary judgment, ECF No. 20, which Williams opposes, ECF No. 22. Because the court will consider exhibits outside of the pleadings to determine the outcome of this case, the motion will be treated as one for summary judgment under Rule 56. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow Defendants' motion for summary judgment will be granted.

---

[1] Williams also asks that charges be filed against Defendants. ECF No. 1. To the extent that he complains that he has been unable to press criminal charges against the officers, Williams has failed to allege a violation of a constitutional right, because "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Otero v. United States Attorney General*, 832 F.2d 141 (11th Cir. 1987).

**Complaint Allegations**

Williams alleges that in response to a "peaceful protest" at Maryland Correctional Training Center ("MCTC") concerning the quality of food, he was assaulted on the afternoon of January 11, 2016, by Defendants McKinley, Yonker, Fiorita, Bair, Durboraw, Carr and Hollar. Williams states that he was asleep in his cell and unable promptly to respond to Defendants' demands that he remove the covering from his cell window, at which time Defendants entered his cell, pushed him to the ground, and hit and choked him until he lost consciousness. ECF No. 1, ECF No. 3 at p. 8. Williams does not allege any misconduct on the part of Defendant Morgan, MCTC's warden.

**Defendants' Response**

Defendants' sworn statements and video footage submitted with their summary judgment motion demonstrate that the actions taken to extract Williams from his cell were neither random nor unprovoked. On January 11, 2016, MCTC staff were conducting feed-up of the C-tier of Housing Unit 7, a segregation unit where prisoners had food delivered to their cells. ECF No. 20-2 at ¶ 3, Decl. of Lt. William McKinley, with attached records. Williams was an inmate incarcerated at Housing Unit 7, C-Tier. *Id.* That day, several of those housed on the Unit refused their meals, yelling for others to do the same. *Id.* at ¶ 4. The incident began around 8:45 a.m. and continued through the day. *Id.*

Prison staff attempted to ameliorate the disturbance by providing an extra cookie with the meals, but the demonstrators wanted additional protein. *Id.* When told the meals that they received were identical to those provided other prisoners, including those in general population, some prisoners began clogging their toilets around 10:00 a.m. *Id.* at ¶ 5. Those who did so had

2

their water shut off, and those who were deemed insubordinate were written up for violating institutional rules. *Id.*

Prisoners then began to impede the staff's ability to conduct a "count"[2] of those on the tier by blocking the windows on the cell doors in violation of prison rules. *Id.* at ¶ 6. By about 4:10 p.m., many windows had been covered and only five prisoners had accepted their meals. *Id.* at ¶ 7. McKinley, who was the officer in charge, requested permission from his superiors to assemble a "Forced Count Team" and conduct a "forced count" wherein a team of officers opens a cell door to account for the occupant(s). *Id.* at ¶ 8. Because a forced count is often preceded by an inmate covering his cell window and refusing to remove the obstruction, an officer opening the door is not certain of what is occurring inside the cell. The officer may be vulnerable to an attack, or the prisoner may be attempting an escape. *Id.* Due to the nature of forced counts and the risks involved, they are videotaped, and officers are usually dressed in riot gear, which may include body armor and a shield, along with pepper-spray. *Id.* at ¶ 9.

McKinley received permission to assemble the team of officers to conduct a forced count around 5:30 p.m. *Id.* at ¶ 10. The team included McKinley and Defendants Bradley Younker, Duane Bair, Gary Durboraw, James Fiorita, and Harry Carr. *Id.* at ¶ 10 and p. 5. McKinley can be seen on film talking into the camera explaining the situation. ECF No. 20-3, Cell Extraction Video, Disk 1, 00:01 – 1:18. He introduces himself and members of the team assembled to conduct the forced count. *Id.* Each officer is suited in armor, which has an assigned number for identification. *Id.* McKinley explains that a nurse is also present to attend to any medical needs that may arise. *Id.* The officers are introduced, and the number on their body armor is identified on camera: Younker, assigned number 3; Hollar, assigned number 4; Durboraw, assigned

---

[2] During a "count," staff look into each cell to tally each prisoner on the tier, to assess his presence and check on prisoner safety. A count typically is performed during shift changes. *Id.*

3

number 6; Bair, assigned number 328; Carr, assigned number 2; and Fiorita, assigned number 5. *Id.*

Williams was among those who had blocked his cell window. ECF No. 20-2 at ¶ 10. After Williams refused to uncover his window, McKinley ordered that the cell door be opened by the "Force Count Team." *Id.* The video shows a team of officers arriving at Williams's cell. ECF No. 20-4, Cell Extraction Video, Disk 2, at 00:55. The window is obstructed. *Id.* Officers are heard ordering Williams to remove the obstruction, warning him that failure to do so promptly will result in the door being opened. *Id.* at 00:55-1:15. After the obstruction is not removed, the cell door begins to open. *Id.* at 1:20. After the door is open, Sgt. Younker, standing in the doorway enters the cell, followed by other officers, who can be heard repeatedly yelling "stop resisting." *Id.* at 1:23 –1:48. An officer turns on the light to the cell. *Id.* at 1:33-1:38.

Younker avers that when the cell door was opened, Williams lunged forward. Younker Decl., *Id.* at ¶ 11 and p. 5. It is impossible fully to discern this from the videotape, because the camera was shot from the hallway and/or at the cell door, behind the officers who entered the cell. Williams' leg can be seen on the bottom bunk-bed, indicating he was not on the ground, with his palms placed on the floor, as directed. ECF No. 20-4, Disk 2 at 2:03. Williams explains he failed to comply because he was asleep on his bed at the time defendants entered his cell. Williams is pinned down and handcuffed. *Id.* In total, the extraction took approximately two-and-half minutes. *Id.* 1:23 - 2:50. The cell door begins to open at approximately 1:20, with officers entering the cell at approximately 1:23. *Id.* By 2:50, the officers are carrying Williams, handcuffed, out of the cell. *Id.*

Surveillance footage shows Williams being carried, while handcuffed, to a special containment cage. *Id*. at 2:50 to 3:32. The footage does not show that Williams was struck in any way during this time, nor does it show that Williams was unconscious. *Id.* Once placed in the cage, he is helped by an officer who assists him in sitting upright. *Id.* at 3:32 – 4:10. Williams is heard expressing difficulty breathing, *id.,* and was taken to the dispensary for medical treatment at about 5:44 pm. ECF No. 20-5, Medical Records of Andre Williams at p. 2. His vital signs were stable and he had no abrasions or bleeding. Williams complained of a sore back but was able to walk and move without problem. *Id.* He had some redness on the right side of his face, but left the dispensary in fair condition and was returned to the custody of the prison staff. *Id.*

Williams received a "Notice of Inmate Rule Violation" charging him with violating five institutional rules: Rule 100 – Engaging in a disruptive act; Rule 101 – Committing assault or battery on staff; Rule 312 – Interfering with or resisting the performance of staff duties; Rule 400 – Disobeying an order; and Rule 408 – Misuse, alter, tamper with, damage, or destroy state property or property of another. ECF No. 20-2 p. 4. Williams pleaded guilty to violations of Rules 312, 400 and 408 at a disciplinary hearing held on March 14, 2016. *Id.* at pp. 5-10. The hearing officer determined he was guilty of violating Rule 100 and Rule 101 as well. *Id.* at p. 9.

**Standard of Review**

Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

<u>Eighth Amendment: Use of Force</u>

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the

response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 38.

**Analysis**

Williams' response in opposition, which does not include a declaration under oath,[3] does little to refute Defendants' assertion that the use of force in this instance was necessitated by his refusal to comply with orders. None of the perceived disputes of fact noted are material. Williams did not comply with orders to remove the covering on his cell window, preventing officers from monitoring him. The videotape of the incident does not provide an unobstructed view of what occurred when officers entered the cell, as the officer running the videotape remained at or near the cell entrance.

The entire cell extraction took only a few minutes. The video does not show whether, as Defendants maintain, Williams lunged at an officer when the cell door opened or, as Williams maintains, he remained on his bed half asleep. Subsequent force, which appears to involve taking Williams to the floor, handcuffing him, and carrying him to a cage, does not appear to be malicious or sadistic. The evidence only shows that the amount of force used was tempered, and employed in furtherance of a penological objective; gaining control of an insubordinate inmate posing a security threat. Aside from back soreness and redness on his face, Williams does not appear to have sustained any injury as a result of the incident. The Defendants who participated in the cell extraction are entitled to summary judgment in their favor.

---

[3] Williams' complaint also is unverified.

Williams's unspecified naming of Warden Morgan as a Defendant also fails. Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Supervisory liability under § 1983 must be supported with evidence that:  (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  Where, as here, there is no constitutional injury suffered, supervisory liability is not established.

      A separate Order follows.

June 6, 2017                                                     _____/s/_____
                                                              DEBORAH K. CHASANOW
                                                              United States District Judge